This is Phillips v. City of Belleville I'm Penny Livingston. We're here today because Belleville demolished a building. They actually demolished two buildings without any notice to the building owners. In fact, the building owners objected to the demolition. The first floors of the buildings were completely intact. You can see from the photographs, computers, people's photographs of their kids. The law in Illinois is specifically stated in statute and that law is to protect the building. If it were an emergency situation, you still have to have a court order. So after you send the 15-day notice, you still need a court order. And under the case law from the Supreme Court of Illinois, you not only have to show the city not only carries the burden of proof with sufficient evidence to show that the building was unsafe and dangerous, but they also have to show that the building was basically beyond repair. In fact, the Aurora case from the Supreme Court says you have to determine the value of the building before you can tear it down. The city called Hanks Excavating at 7 o'clock in the morning and said, come on down to tear this building down. They were ready to tear the building down before they ever had any evidence that the building was unsafe or structurally unsound. The case law tells us that you need a structural engineer to determine if the building is structurally unsound. They called a structural engineer. She couldn't go in the building. It was on fire. In their affidavits in the motions for summary judgment, the city had two affidavits that stated, well, the structural engineer agreed with us. They never brought the structural engineer. They never told me who she was, what her name was, anything. When I finally find the structural engineer in the midst of summary judgment motions, she tells me, I never went in the building. I never gave a professional opinion. I never said anything that they're saying I said. And she signed an affidavit to that effect. And it's in the record. So the city tears the building down without notice, without permission, without a court order, without even knowing if the building is unsafe. The roof on the on my client's building had been destroyed. The roof at the top of the building and some of the walls had been. But you can see from the pictures and I know looking in the index last night that they're not very in the appendix. They're not very well seen in the photocopy of it. But you can see the steel beam once they tear the neighboring building down so that the beams. This is a steel and mortar building. The city had cordoned off an area that had a few bricks that had fallen down. I don't think there were even a dozen bricks. They asked Chester Nance, can we tear that wall down? That's a fake facade since bricks are falling down. Hey, they cordoned off for beer gardens. They can cordon off for a few bricks that are falling when there's a fire. Is that evidence in the record that they cordoned off for beer gardens? No, I just added that, Your Honor. Sorry about that. I happen to know they do. If you go through Belleville, you'll see they do. But at any rate, the point is that to make to make it safe for the public, if they're really concerned about safety for the public, how about the fact that they demolish buildings every year and they know that commercial buildings have asbestos in them? And before you can tear a building down, you have to send notice to Illinois EPA. They have to come and inspect if they want to. They get 10 days for that. And you have to adequately wet. You might need to remove the asbestos. You have to take precautions. You don't just spray asbestos all over the place. So we have the city creating an additional nuisance of asbestos abatement needing to be done. And all this while, the property owner does not want his building to be taken down. We fight in the motions for summary judgment, which are extensive. The only evidence in the record of asbestos is in the motions for summary judgment. That was not presented at all at the trial on the counterclaims. The judge, in his final order, orders not only that the plaintiff pay for the demolition that he opposed that was totally unlawful, but he orders him to abate the asbestos, which the city created by their unlawful demolition. The judge found that the city was immune from prosecution for what they had done here, even though the statute clearly creates liability. 147 says if you injure a party in your activity of demolition, you have to pay for those damages. And he finds that they're completely immune. They were making a policy decision. Therefore, the demolition was lawful. I'm sorry, you have a question? Didn't the Phillips first attorney agree to do that? The attorney that Mr. Phillips had wrote some letters, and in those letters he said, my guy will turn over the check for the insurance proceeds. He did represent that. He did not consult the client on that. The client testified he didn't consult me on that. I never agreed to it. And if he had agreed to it, which Mr. Daniels surely did agree to it, he didn't have authority to do that. And what's the consideration? It's more like a revocable gift. Hey, we'll pay you after the fact for a demolition that we opposed. The fact that Mr. Phillips never turned over the check until he was ordered by the judge shows you that he was not ratifying what his lawyer was doing in that case. He was in fact saying, no, I don't want to pay for a demolition that I opposed. There's also a letter in the record from Mr. Sprague where he says it's- The other lady or man that had the second building gave $25,000 to do that. I agree. He had a better insurance company, and they covered the cost. In Mr. Phillips' case, the amount of money was coming out of his regular amount for the building because they only covered $5,000 for demolition. But yeah, Chester Nance had presented his money for the demolition. And he was not represented by counsel, I believe. So if Mr. Phillips had agreed, then he would have turned the check over. You'll see that there's a letter from Mr. Sprague where Mr. Sprague says, it's not acceptable to us to take the $88,000 check and return $43,000 to your guy. Instead, we'd like to put it into this account. We'd like to do these other things. Mr. Phillips clearly rejected that since he didn't turn the check over. Did the previous attorney sign an affidavit or testify in a deposition or anything about whether or not he did have authority? He didn't. He didn't do that. And so that's why you might find it curious that someone who's done quite a few appeals might file a notice of appeal prematurely, as I did in that case. Honestly, when I read the order and the judge said that he was denying, he denied my motion to dismiss their counterclaims, but he denied their motion for summary judgment on it, honestly, I didn't think there was anything else to do since they had presented everything that they absolutely had, which the trial record shows, too. They had nothing else. All they did was present these letters. Yeah, that's what I'm trying to get at. Which had no foundation and were hearsay. You indicated earlier that Mr. Phillips testified, I assume, in a deposition that he did not give his attorney authority. Was there any counter to that anywhere in the evidence? There was no counter to that anywhere in the record. And, in fact, at trial they presented the letters and they even asked Mr. Phillips, did you receive this letter, and he said, no, I didn't. It was addressed to my sister's address. I didn't even receive it. But even if he had, which he hadn't, you have to have consideration to have a contract, and the consideration has to flow both ways. Where would he have consideration? He didn't receive anything but a demolished building that made him lose the value and lose $3,500 a month in rent. So if you look at the Supreme Court's case in Villa Hills, you'll see that they set forth the standards for demolition and you'll see that we meet those and they do talk about the extreme remedy. But I'd really like to hit head on, and the Sings case is very good too, and it tells us that the police power is subject to the Constitution and the Constitution is being interpreted through the statute where you have to give notice and due process and find the least invasive way to deal with someone's property, not necessarily to tear it down. But I guess the scariest issue that I need to deal with today, and so I would really like to argue it, is about the jurisdiction. When we filed notice of appeal, we had finally had a final order, and now we could appeal. So we listed the final order and we proceeded to appeal. Within that 30-day period when you can appeal, and I noticed you cited case law where you can actually extend the 30-day. I didn't even know you could do that, into 60 days. But in that 30-day appeal time, in fact within 20 days, we filed our docketing statement. And three places in the docketing statement, we tie the two orders together and we say we're appealing both of these things. Both of these things are about an unlawful demolition. If you look at the Supreme Court's case law from 1979, the Bertall case, they talk about how the purpose of the notice of appeal is to give the prevailing party notice that the unsuccessful litigant plans to go to a higher court. Well, they certainly had notice of that. And it specifically states that if they are not prejudiced, then procedural error in the notice of appeal is not fatal. Well, what would make them prejudiced? Well, if they didn't have notice. Well, they had notice within the 30-day period of all the issues, and all those issues are consistent with the briefs. And that same case goes on to say what – let me just read it exactly. It says, when an appeal is taken from a specified judgment only or from a part of a specified judgment, the court of review acquires no jurisdiction to review other judgments or part thereof not so specified or not fairly to be inferred from the notice as intended to be presented for review on the appeal. Well, we know what our intent was. We prematurely appealed. We listed in the docketing statement in three places, tied the two together, and, of course, our briefs are there. It says, if the notice of appeal itself and the subsequent proceedings – I'm sorry, if from the notice of appeal itself and the subsequent proceedings, it appears that the appeal was intended and the appellant and appellee so understood – well, you'd understand from the docketing statement. My entire brief is based on what we say in the docketing statement – to have been from an unspecified judgment or part thereof, the notice of appeal may be construed as bringing up for review the unspecified part of the order or judgment. Such a construction would be appropriate where the specified order directly relates back to the judgment or order sought to be reviewed. And then they go on to say that if it is a procedural progression in the case, if the prior order was a procedural progression in the case, then it would be most appropriate. Well, you can't charge us for the demolition and make us abate the asbestos unless you found that the city did not have an unlawful demolition and that the city was not immune. So the judge found they were immune and they didn't have to comply with the law. You can't even get to ordering us to pay for the demolition and abate asbestos unless you first made those findings. And at trial, we didn't even talk about asbestos, but in the final order we're ordered to remove the asbestos that the city created as a nuisance. And the court goes on to talk about how the purpose of specifying your orders is to not have piecemeal appeals. Well, we're not having a piecemeal appeal. We're here on all of the issues now. And it talks about how the appeal from a subsequent final judgment draws in question all prior non-final orders and rulings which produced the judgment. You couldn't have got to the final judgment unless you had the previous judgment. So that's where we're at on that. And the case law is pretty well on that, talking about the notice and what the purpose is. And they even cite federal law as an example. And in the federal law, they appealed an injunction order, and the court said, well, see, they could talk about the other issues other than that injunction order too. This is how. And they talk about liberal construction of it. And that the appellee, unless the appellee is prejudiced thereby, the absence of strict technical compliance with the form of the notice is not fatal. And where the deficiency in the notice is one of form only and not of substance, the appellate court is not deprived of jurisdiction. It would be totally unjust to deprive the court of jurisdiction in this case. What are we here for? We're here because the defendants did not give the plaintiff any kind of procedural due process on a constitutional right at all. They didn't give him notice. They didn't get his permission. They didn't go in front of a court. They didn't find that the building was unsafe. They didn't even develop the evidence. Do you have a question? No? You're just looking at me curiously. Okay. Questions are easier, guys. I'll ask one if I have one. Okay. Go ahead. But then after he's deprived of his building, you know, they tell him you can get your stuff out. And then he shows up with a ban and they say, sorry, you can't get your stuff out. After he's deprived of his building, then he's deprived of his day in court to talk about it before they demolish it. But then he's also deprived of his day in court after they demolish it because the court decides, well, the city's immune. It's a policy decision. The judgment of the judge in both orders is totally contrary to the law. It's clearly erroneous. I had a terrible time determining the standard of review since there were so many applicable to the different parts of it. But whether the standard of review is de novo or the standard of review is clearly erroneous, we have a plaintiff who has been deprived of his property without compensation and without any procedural due process or substantive due process at all. And that cannot be the state of the law in Illinois and the Supreme Court in its Villa Hills case specifically states no matter what, emergency or not, you need an adjudication. You have to go in front of a judge. The courthouse, this fire was on a weekday, and the courthouse is four blocks from where this fire is. So they could have applied for an injunction. I know I have personally applied for TROs. Give the other side phone notice. Get in there and get a TRO. So they could, if they really thought the building was dangerous, they could have done this. If the building was really dangerous, then why didn't you let the structural engineer make that determination? The attorney, Daniel, I guess, he says in the letter September the 29th to Robert Craig, Sarah, that two-thirds wouldn't pay the two-thirds of the bill for Hanks. Is that right? The letter says that. I agree that the letter says that. The case law says that. It said Phillips agreed. That's what the letter says. The letter says that. Why would Phillips agree to pay for a demolition that was unlawful? And if he doesn't. That's what his attorney said, right? I agree. His attorney said it. I do agree, Your Honor. So if there's a problem, wouldn't it be for your client has against the first attorney then? Well, if he had malpractice insurance, I guess that might be an issue. The thing is that he didn't have authority to speak for his client, but also the case law talks about if you're out of court, you have to get your client's express authorization to do what you're doing. If you look at his letters, he talks about photo ops and, you know, some things like that. But even if he had obligated, let's say that he said, hey, my guy will pay this, where's the consideration? Consideration has to flow both ways, and there's no consideration for that promise to pay. So it's essentially a revocable gift, which you could then say the client revoked because he didn't want to pay it, and he never gave his attorney authority to express that. You would need an offer, an acceptance, and consideration. And I'm not sure of the date on the letters, but if you look at Mr. Sprague's letter where he says your proposal to give him a rebate is not acceptable to me, if that letter is after the fact, then you may see that you also don't have a meeting of the minds with respect to how to even pay for the demolition. They had first asked for, I think, $88,000, which was for the whole demolition of both buildings, not just for the one. If you don't have consideration, then how would you agree to pay for it? And if the demolition is unlawful, which it is, then why should you be ordered to pay for it if you had revoked your promise to pay before you had done it when there was no consideration? I don't know if you have any other questions. I really appreciate it. Thank you. May it please the court, counsel. My name is Julie Broeck of the law firm of O'Halloran, Kossoff, Geithner, and Cook. And with me today is Alvin Paulson of Becker, Paulson, Horner, and Thompson. Focusing on the issues that we are here for today in the appeal, there was a complaint that was filed by Ronnie Phillips against the city of Balboa. In that complaint, he sought monetary damages against the city for the destruction of his property, for rebuilding his property and loss. He had a renter that was in the property. He wanted the city to pay for that. The city, in turn, filed a counterclaim against Mr. Phillips. In the counterclaim, we asked that a check that was issued by State Farm Insurance Company made payable to the city of Balboa and to Ronnie Phillips be endorsed by Mr. Phillips and turned over to the city of Balboa. In the counterclaim, we also asked for a second type of relief. We asked that a court determine that the property was a nuisance and that Mr. Phillips be ordered to clean up that property. We filed a motion for summary judgment in 2012. The court granted the motion for summary judgment as to all of the claims that were brought by Mr. Phillips. As a result of that decision, the city of Balboa would not have to pay any money to Mr. Phillips. That issue was decided. The court found that there was a question of fact as to the counterclaim brought by the city of Balboa against Mr. Phillips. Fast forward to April of 2013. There's a trial. There's a bench trial. At the bench trial, the sole issue that was heard by the court was Balboa's counterclaims. Does Mr. Phillips have to endorse the check? And who does Mr. Phillips have to clean up his property? That was the only issue. The court issues a decision in April of 2013 finding in favor of the city of Balboa on both of those claims. Within 30 days, Mr. Phillips files his notice of appeal. In his notice of appeal, the only issue that he appealed was the April 2013 court order, and the relief that he requested was that this court reverse the April 2013 order in favor of the city of Balboa. No mention was made at all of the December 2012 ruling on summary judgment. Counsel indicated in her argument that this court should excuse that error because in the docketing statement that was later filed, it identified the December 2012 order. GMC versus Pappas. Illinois Supreme Court, 2011. This is what the Illinois Supreme Court said about that argument. While the collector asserts that the issue was identified in the docketing statement, it is axiomatic that a docketing statement does not confer jurisdiction on the appellate court to consider the matter. There's no jurisdiction at all for this court to decide the issue of whether or not the court should have granted summary judgment in favor of the city of Balboa. That issue has already been decided. So now the focus of the court on the appeal is when you have a situation where a private property owner's property is damaged beyond repair, who should pay the cost to demolish the property? Should it be the taxpayers and residents of the city of Balboa, or should it be the private property owner whose property was damaged? In this case, Mr. Phillips had insurance to cover the cost of the demolition. And that's important. And why is that important? It's important because the Illinois legislature has said that it is the private property owner's responsibility to pay those costs. If you take a look at section 397.1, subsection D1 of the Illinois Insurance Code, that section provides that when you have a situation where property is demolished, the insurance company is required to name the municipality on the check. So State Farm had to name the city of Balboa as a payee on the check because the city of Balboa essentially has a lien on that money. There are cases that we cite in our brief that talk about the fact that if you have a physician's lien, if a physician places a lien on a personal injury case, and the insurance company issues a check and they don't actually turn the money that proceeds over to the physician, the physician has a claim because he's rightfully entitled to that money. The same situation occurs here. The city of Balboa is rightfully entitled to the insurance proceeds from State Farm. State Farm knows that. That's why State Farm named the city of Balboa on the check, and it was Mr. Phillips who refused to turn over that money. So the trial court determined that that was a breach of contract. Whether this court determines that's a breach of contract, that's promissory estoppel, conversion, unjust enrichment, whatever theory, the end result is that the city of Balboa was entitled to that money. The trial court determined it was a breach of contract based upon the representations made by Mr. Phillips' prior attorney in the letters. Is that what happened? The trial court determined that there was a breach of contract. There was no specific findings in the order as to the basis of that ruling. Well, the basis of your claim, city of Balboa's claim in the trial court, was that a contract was created to turn over that money through the letters from the attorney. Am I misunderstanding? Absolutely. That's what you sued and said. We did. We said we basically made two arguments. We made the first argument was this 397.1, which we brought to the court's attention. We gave the judge a copy of that section of the code. The lien doesn't make a contract. That's what we argued, conversion on that. We were saying that that could be a conversion. I understand. Was there any other basis in the record, any other factual claim or evidence or whatever that would support the trial court's finding that there was a breach of contract other than the contract through the previous attorney? No, that it would be through the previous attorney. That was the basis of that. Exactly. Okay, now let me ask you the same question I asked Ms. Livingston. You know, she says that Mr. Phillips testified he did not give the attorney authority to do that. Okay. And did the other attorney testify? Did he ever say he did have authority? No. We introduced these letters as admissions because Mr. Phillips testified at trial that he had hired or that Mr. Daniels was his attorney. If you take a look at the letter that was, it was December 20, 2010. The letter was written from Mr. Daniels to Attorney Bob Sprague. And in there he writes, Bob, I was able to confer with Ronnie Phillips on Friday, December 17, 2010. We are in agreement for him to endorse the $88,578 state farm check over to either the city of Belleville escrow account or your Sprague and Urban Trust account for a deposit. So our contention was that this was an admission. The basis for it being an admission is that it is an agent with authority from his principal. Exactly. Isn't there a problem if the principal testifies in the case that the agent didn't have authority to write that letter and there's no contrary evidence? The next question that I asked Mr. Phillips at trial was, in 2011, so first of all, did you know about this letter? He said that even though it was not addressed, it was not mailed to his address, that his sister read the letter to him. So he was aware. And I asked him, well, in 2011, in January 2011, was Attorney Daniels still your attorney? Yes, he was. So the argument was that he ratified this agreement knowing that Mr. Daniel had sent this letter saying that there was an agreement. He never disclaimed that. And there's testimony of meetings that took place between the city of Belleville and Mr. Phillips. And, in fact, Mr. Phillips then affirmatively called the mayor and said, how much should the check be made out to? And the mayor gave him a dollar amount. Mr. Phillips, in turn, called his own insurance company and told them, this is how much the check should be made out to, to the city of Belleville and to him. So based on those actions, and the trial court was in the best position to decide which party to believe on that issue, and clearly he determined that there was a valid contract and that it was breached by Mr. Phillips. And that could have been through ratification. Yes. Although not expressly said. Exactly. The next issue that was brought up on appeal, on our counterclaim, was the issue of the nuisance. Who has to clean up this property? And both sides agree, there is no dispute whatsoever that there was asbestos on the property, that there was a nuisance. That is agreed to by the parties. Mr. Phillips testified at trial that he does not know the source of the asbestos. So he doesn't know whether it came from his building. He doesn't know whether it came from the adjacent property owner's property. But there was asbestos on the site. And the parties were in agreement that under the EPA regulations, it has to be cleaned up. So the question is, who has to clean that up? And the only evidence that was brought forth by Mr. Phillips at trial to suggest that he should not have to pay the cost of the cleanup was his argument that the City of Belleville had unclean hands because the City of Belleville improperly demolished his property. The problem with that argument is that the trial court had already decided on summary judgment that the City of Belleville was entitled to demolish the property. And that issue was res judicata. So it was not considered because it was already decided. The building inspector for the City of Belleville came in and testified at trial, brought in pictures of the current state of the property and said, I believe, in my opinion, that this property violates the Belleville local ordinance on nuisance and it should be cleaned up. That was what the court found. So the court ordered that Mr. Phillips had to clean up the property. And it hasn't since this time been cleaned up. The remaining issues that were brought up in the appellate brief are all issues related to whether or not the City of Belleville was entitled to summary judgment back in December 2012 on those issues of whether or not the City acted in accordance with statute and whether or not the City of Belleville is entitled to Tour Immunity Act. Again, it's the City of Belleville's position that there is no jurisdiction whatsoever for any of those issues that they should not be considered by the court. If the court would like me to address those issues, I certainly can and I'm willing to do so right now. But otherwise, I would suggest that if there are no other questions, then we ask that the judgment in favor of the city be affirmed. The first thing I would note is when Julie says that as a result of the summary judgment decision, the city didn't have to pay any damages for tearing this building down. That's true, but also the plaintiff was seeking injunctive relief. In fact, we had a motion for preliminary injunction. Negotiations broke down and we never got our preliminary injunction. But we were also seeking injunctive relief for the nuisance of the asbestos that they created. And that was also denied. When we get to the final order, the judge orders us to abate the asbestos. When she says that Paul Baumann testified, he did indeed. But he testified that there were weeds and that weeds violated the ordinance. He did not testify to asbestos. So everybody was treating all the issues as though they were the same, including the judge in his final order. If he's dealing with asbestos in the final order, the only place we ever dealt with asbestos was in the summary judgment motions. How do we know there's asbestos? Because Chester Nance signed an affidavit saying the asbestos came from the tile in his building. And in the summary judgment, we had a report from Illinois EPA where Illinois EPA, speaking of people not honoring their agreements, told Belleville that it was their responsibility to hire a contractor and that they needed to. And Mr. Tim Gregowitz said that he would. And that's in that memo. So that's in the evidence. So it wasn't just they wouldn't have to pay damages. It was that we were also denied our injunctive relief, which later in the final order, even though that's not an issue at trial, it is in the final order that we are ordered to clean up the asbestos. So all of the issues are tied together. When you say it was not an issue at trial, did the city, was that in their pleadings? It was in their pleadings. They were asking for Mr. Phillips to be ordered to clean up the asbestos in their complaint, their counterclaim. They were. And in that same, in the response to that counterclaim, we had six affirmative defenses. And other than. . . If that was part of their complaint and part of their prayer for relief, why would it not be an issue at trial? Well, when you present some evidence, they did present Chief Langston, and he only testified on one issue, that it was right to demolish the building. They did have the burden of proving that they had properly demolished the building. So your argument, you're saying it was not an issue at trial, but your argument is they had a failure of proof on that issue. They certainly did. Is that what you're saying? I would say that they did have failure of proof on that issue. They did not carry the burden of proof. They didn't supply any evidence. The only evidence is back in those summary judgment motions. So if, and if you look at our affirmative defenses, other than unclean hands, every affirmative defense is, you tore our building down when it's unlawful to do that, you shouldn't be tearing our building down. And if you look at the testimony that we solicit from Mr. Baumann, he testifies, what is fire safe condition? And I actually asked the judge orally, will you please reconsider your decision from the summary judgment? Because you can see that he is telling you fire safe condition is that do your sprinklers work? Do you have a firewall? Are you preventing a fire from occurring? That's what fire safe condition is. So even as we're doing that trial, we're looking at the issues of how did you even get to where you demolished our building that you're even asking us to pay for it, or that you're asking us to clean up the asbestos. And where's the necessary party, Chester Nance? If we're going to clean up the asbestos, where do we draw the line and only clean up our part, and how do we not get any on him? So if the city was going to get, you know, ask us to clean up the asbestos, they would kind of need Chester there. Now, Chester was with us, and we eventually cleaned up the asbestos with Chester. But he would have been a necessary party for the city to pursue us on the asbestos, and he was not there. And we actually argued that in our motions as well. I also filed a motion to dismiss the counterclaim. And in the decision on the summary judgment, the motion to dismiss the counterclaim was also intrinsically denied in that since it was then set for trial. The summary judgment was interlocutory, and until the judge decides the final order, that is in play. And since you couldn't get to the next issues unless you got to the issue that it was a lawful demolition, and that the city was immune from prosecution so that we could be the party ordered to abate the asbestos that they created. You know, they cited case law, or they cited a statute to the judge that said municipalities and governments are exempt from complying with asbestos regulations. But what it said is, unless they take control of the property, you know, if they inherit a property, that's one thing. But if you take control, well, they took control. They hired Hank. They called him at 7 o'clock in the morning and said, come demolish this building. They had decided from day one, from moment one, I guess, that they were going to tear this building down. And the Belville inspector tells us at trial what fire safe condition is. And it's not. You can tear our building down and now say it's fire safe. And that's okay to violate the law and not follow the procedure so that you can, so that a protected property right under the Constitution is protected. Thank you so much. Thank you both for your briefs and arguments, both the matter of your advisement and the issuance of the decision. Thank you very much.